# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Dr. Catherine Gwei-inn Lin-Hendel, Ph.D. Physics
Dr. Rudolf Heinz Hendel, Ph.D. Physics
PROSE

       Plaintiffs

   -against-

The Saudi Arabian Oil Company (Saudi Aramco)
Saudi Aramco Energy Ventures (SAEV)
Aramco Americas (Houston, TX)

CEO and President: <u>Amin H. Nasser</u>
SVP, General Counsel and Corporate Secretary:
       <u>Nabeel A. Al Mansour</u>

Saudi Aramco Trading Company (SATC)
CEO: Ibrahim al-Buainain

& Other Subsidiaries

    <u>Defendants</u> (Saudi Aramco, et. al.)

## COMPLAINT

Jury Trial: ☒ Yes

RECEIVED
DEC 12 2019
AT 8:30 ___
WILLIAM T. WALSH, CLERK

---

**I.    Parties in this complaint:**

A:    <u>Plaintiff Information</u>

Name 1: Dr. Catherine G. Lin-Hendel, Ph. D. Physics
Name 2: Dr. Rudolf H. Hendel, Ph.D. Physics
Street Address     26 Ridge Road
County, City       Union, Summit,
State & Zip Code:    New Jersey, 07901
Home Telephone #:    (908) 273-3378;
Mobile #s:          (408) 761-3559; (408) 533-5847
Emails: rudihendel@gmail.com;    linhendel@gmail.com

B:    <u>Defendant Information</u>:

Defendants: Saudi Aramco, et. al.

Headquarters Mailing Address:
P.O. Box 5000 (or Corporate Communications Department, North Admin Building)
Dhahran 31311, Saudi Arabia
Tel: +966 13 872 0115;    Emai: international.media@aramco.com

**Summons To Be Served in the Care of:**

Saudi Petroleum International Inc.—A US Subsidiary and Representative of Saudi Aramco
CEO and President: Samer Al Hokail
527 Madison Avenue #23
New York, New York 10022
Tel: (212) 832-4044

## II. Basis for Jurisdiction:

Federal courts are courts of limited jurisdiction. There are four types of cases that can be heard in federal court: 1) Federal Question - Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case; 2) Diversity of Citizenship - Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case; 3) U.S. Government Plaintiff; and 4) U.S. Government Defendant.

A. What is the basis for federal court jurisdiction? (check all that apply)
    ☒ Federal Questions                                    ☒ Diversity of Citizenship

B. If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue?

Willful Theft of Intellectual Property (15 USC Chapter 107)
Willful Patent Infringement and Patent Theft; (35 U.S. Code § 271--Patent Infringement;
35 U.S. Code § 281--Remedy for infringement of patent--A patentee shall have remedy by civil
       action for infringement of his patent;
Organized Conspiracy of Theft and Plunder against the Plaintiffs' Intellectual Properties;
Interference and Deprivation of Plaintiffs' Economic Advantages, Opportunities and Wellbeing.

## COMPLAINT FOR WILLFUL INFRINGEMENT AND ORGANIZED THEFT AND PLUNDER OF INTELLECTUAL PROPERTIES IN PATENTS BELONGNING TO THE PLAINTIFF BY SAUDI ARAMCO AND ITS SUBSIDIARIES, INTERNATIONAL BRANCHES, REPRESENTATIVES, PARTNERS AND INVESTORS

INTRODUCTION

1.      This complaint arises from Defendants' unlawful and willful infringement on United States patents **7,308,653, 7,712,044, 8,108,792, 8,850,352, 9,053,205, 9,405,852 and 10,296,198** –a family of patented inventions teaching Auto-Change-of Displaying Content or Auto-Scrolling-Change of Displaying Content, more specifically teaching programming multiple

content-sets to display in a time-shared fashion in a designated display area, displaying one content set at a time, and to automatically changing the displaying of content-sets. The invention improves the utilization productivity, effectiveness and dynamism of a designated display area, while also drastically improving productivity, user-friendliness and attractiveness of the website. **This family of patented inventions has a priority date of January 2, 2001**. Defendants also unlawfully and willfully infringe on a separate patented invention **8,438,487**—One-Click Navigation, teaching a system and method enabling a site visitor to directly reach a page many hierarchical levels away from essentially any location/page in a website. **The priority date of this patent is May 24, 1999**.

    2.        Plaintiff Dr. Catherine Lin-Hendel is the inventor of these patented inventions and Plaintiffs Dr. Catherine Lin-Hendel and Dr. Rudolf Hendel are co-owners of these patents. They have been married for 46 years and are partners in life and work. The entirety of the **first issued patent 7,308,653** of the family of related patented inventions and the first and the claims pages of each of the subsequently issued patents sharing the same specifications with 7,308,653 are presented in **Exhibit 1.** Patent **8,438,487** is presented in **Exhibit 2.** Dr. Lin-Hendel's portfolio of patented inventions which Plaintiffs own are presented in **Exhibit 3**, some of which Defendants may also have infringed on and which Defendants could have easily found out through a Google search with Catherine Lin-Hendel's name or a search on any one of the numerous publicly available patent data bases such as www.freepatentsonline.com upon receipt of Plaintiffs' first Infringement Notification Letter sent to Defendants in September 2017, and a cursory review by Defendants' legal department or any one of Defendants' IT Departments or Technology Research and Development Centers. While infringements on the above listed patents are visible on the top screen of the homepages of Defendants' websites, infringements on Plaintiffs' other patents would be deeper in their webpages, websites, or business operations, and difficult for Plaintiffs to find out, unless stumbled upon by chance. Law and Corporate Ethics require Defendants to inform Plaintiffs of Defendants' past and existing infringements on any one of Plaintiffs' patents, and inform intention to use any one of Plaintiffs' patents before use.

3. Plaintiffs are physicists, technologists, inventors and entrepreneurs, having a long history of high performance work in research and development of high technologies in the United States, including Dr. Lin-Hendel's 15 years and Dr. Hendel's 5 years at the worlds' most prestigious AT &T Bell Laboratories during the apex of Bell Laboratories' accomplishments. In the late 1990's Dr. Lin-Hendel took an interest in the great potential of the Internet for consumer and business uses and left Corporate America to develop technologies which would help make the Internet a more dynamic, effective and user-friendly platform for communications & business transactions for people and for businesses.

4. With Dr. Hendel's financing and support, Dr. Lin-Hendel's work on Internet Technology resulted in many ground breaking inventions, for which she applied for US patents beginning in 1999, including the patents listed above, and of which Plaintiffs became aware in 2017 that Defendants were unlawfully using without authorization from Plaintiffs.

5. A patent application for an invention must prove the invention to be novel, solving a significant problem, providing a solution superior to and conferring significant benefits over existing prior-art in the field of the invention, and to **teach the invention** to the extend such that **ordinarily skilled in the field of invention are able to implement and duplicate the invention.** US patent applications, when allowed and issued as US Patents have gone through a thorough and extensive examination by the USPTO. Patent applications and issued patents are all published in numerous public domain databases in the English language, the universal language for science and technology, internationally and universally understood and monitored by all skilled, ordinarily or otherwise, in the field of science and technology. For the teaching of an invention in its published patent application and/or issued patent, those who intend to use the invention are to contact the patent owner listed on the published application and issued patent, to apply and negotiate for an authorized use-license before usage can lawfully commence.

6. Unfortunately, in an increasingly litigious world, unethical corporations are armed with the fact that there are an abundant number of dishonest attorneys well trained in the art of

sophistry readily available for hire to argue the unarguable to overwhelm small-entity patent owners and inventors who lack the financial resources to hire even the most basic legal representation. Corporations, especially multinational corporations often choose to steal patented inventions they wish to use, especially patents which are owned by small-entities such as small businesses and entrepreneurs. Corporations use patented inventions owned by small-entities without paying legally required licensing and royalty fees, robbing small-entity inventors and patent owners of their legally required and well-deserved remuneration and livelihood, and expect to commit such corporate theft with impudence. Such corporations willfully continue to operate unlawfully and in bad-faith even when they receive notification (s) of their infringement of patents owned by such small entities, as Defendants have chosen to do, for the lawless corporate-think is that small-entity and small-business inventors and patent owners lack financial resources to be able to enforce their Intellectual Property rights and patent rights against corporate-theft. Such lawless corporate think and behavior have been endangering the viability and existence of small-entity inventors, small businesses and entrepreneurs. Venture funding has become scarce, for venture investors have lost confidence in being able to enforce small-entity patent rights against corporate-theft, which destroys the eco-system of innovation.

7.  According to Defendants' websites, Saudi Aramco is presently 100% owned by the Kingdom of Saudi Arabia, and is launching an IPO to raise funds from the Stock Markets to help develop Saudi Arabia's economic and technological diversity. The IPO values Saudi Aramco's worth at US$1.7 trillion. Saudi Aramco's 2018 total revenues were US$355.9 billion with net income attributable to shareholders at US$111.1 billion (Exhibit 4A). Aramco traces its beginning to 1933 when a Concession Agreement was signed between Saudi Arabia and the Standard Oil Company of California, giving Standard Oil and the fully owned subsidiary California Arabian Standard Oil Company (CASOC) permission to explore for oil deposits in Saudi Arabia. In 1935 Texaco acquired a part of CASOC. In 1944 CASOC was renamed Arabian American Oil Company, or ARAMCO, headquartered in San Francisco. In 1948 the

1. Aramco headquarters was moved to New York City, and later moved to Dhahran in 1952. In 1973, the Saudi government bought a 25% interest in Aramco, increasing that interest to 60% in 1974. In 1980, the Saudi government gained 100% interest in Aramco, which continues to operate worldwide. It was renamed the Saudi Arabian Oil Company (Saudi Aramco—in short) in 1988 (Exhibit 4B). Aramco Research Centers have been established at major US locations in Houston, Boston and Detroit producing a majority of Saudi Aramco's technology breakthroughs (Exhibit 4C). The Saudi Petroleum International, Inc. headquartered in New York City, is a fully owned subsidiary of Saudi Aramco and represents Saudi Aramco in North America along with Saudi Aramco's six US subsidiaries (Exhibit 4D).

8. American small-entity inventors are the most free and creative minds, free from the usually restrictive and stifling corporate agenda, bureaucracy and politics, therefore are, in general the best and most productive inventors who have created more highly beneficial and valuable inventions contributing to humanity world-wide when compared to corporate R&D staff. Historically, small businesses and entrepreneurs have created most new jobs with their inventions and innovations in the United States of America. Therefore, corporate theft against American small-entity inventors such as Defendants have done is damaging and dangerous to the economic vibrancy, viability and the future of the United States of America and the rest of the world. Saudi Aramco's most important technological innovation and investment activities and technology breakthroughs occur in its Research Centers in the US and startups in the US it invest in, which are managed through Aramco Americas headquartered in Houston, Texas.

EXPLANATION OF BENEFITS OF PATENTS KNOWN TO BE INFRINGED BY DEFENDANTS

9. Patents 7,308,653, 7,712,044; 8,108,792, 8,850,352, 9,053,205, 9,405,852, 10,296,198 belong to a family of patented inventions teaching to program a website to automatically change displaying content in a designated display area in a portion of a webpage, time-sharing the designated display area to automatically display multiple sets of content, each

content-set displaying for a programmable length of time. The changing of displaying one content-set to another content set can be transitioned by automated scrolling with the scrolling action discernable by human eyes or quick and indiscernible, with animated or unanimated slide-show style change, with or without many other optional interactive, attractive, user-friendly or instructional features taught in this family of patents. By using this family of patented inventions website owners can multiply the use of valuable and limited prime display area on any webpage many-fold, dramatically improving the website's attractiveness, dynamism and effectiveness in communicating with Defendants' stake-holders, customers, clients, partners, contractors and affiliates, as well as potential new employees, customers, investors, and suppliers and contractors, while facilitating the convenience and speed of business interactions and transactions. The use of these patents provides a highly effective tool for increasing hit rate, eye-share and browsing time, and viewership and mind-share, and thus is a tremendous marketing, sales, and public-relations tool, benefitting Defendants through:

- Increased viewer attention leading to increasing the time a visitor spends on the page through active and dynamic motion of the site content (compared to a static page),
- Enhanced ranking of the site in Search Engine Optimization due to this increased customer attention,
- Increasing the utility and use of the "high value real estate" on the websites allowing the attractive time multiplexed exposure of high value products and contents/information on a home page, a landing page, or any main page for which a static display cannot provide sufficient space to display objects and subjects that are desirable to be displayed in the page,
- Allowing efficient navigation to specific marketing and purchase pages straight from the dynamically displayed products and content that catch the viewer interest.
- The marketing and product information would otherwise need to be accessed through a conventional search, and complex, multi-click paths, while the reaching the purchasing venue would require an even larger number of clicks.

10.     Also unlawfully and willfully infringed by Defendants is patent 8,438,487 owned by Plaintiffs, which teaches methods and systems enabling a user friendly browsing mechanisms

on a website, including an informational nested/cascading categorical tree structure with each category in all levels of the categorical structure named with a meaningfully representative text embedded with a link, linking to the content related to the named category. The text-named and link-embedded categorical tree structure is made available on the frame of all pages with only the top-level category names displayed, and subcategories easily pulled-up by acting on a named top-level category tab reviewable at any location of the website before choosing to commit to selecting a particular category or sub-category to go to by clicking the named category or sub-category for at least two more levels below the top-level categories. Also taught is an "active navigation string" for visitors to the website to be able to track his/her browsing path in the hierarchically organized website being able to reach, from the present page to any previously visited page by a single click on a text name (sign post) representing the URL of a previous page along the active navigation string. The new and novel navigation method and system taught by this patented invention is in contrast to the conventional method of having to use the awkward and time consuming clicking (or otherwise activating) the "back" icon located at the top- left corner area of the Browser Window Frame, repeatedly, each time waiting for the immediate previously viewed page to load, to finally reach a particular desired previously viewed page often many steps back, or to copy and store the prior pages' URLs on a separate document ready for copying and pasting into the URL entry box on the Browser Window Frame in order to reach a page branching off that previous page. The viewer/user can also search for a particular sub-category page by clicking an upper categorical tab in the conventional path of reaching that page, and look for the particular next page which may have a link on this page (or may not), and to back to the previous page in order to try searching again, thus hunting for a desired page through time consuming trial and error. In a world where promotion, marketing, sales, transactions and other business activities are increasingly conducted on-line, this patent conveys tremendous value to business through far improved far more user-friendly and efficient websites. The above listed family of patents, as well as other patented inventions in Dr. Lin-Hendel's portfolio of Internet and Computing inventions listed in Exhibit 3, which Defendants may also have infringed,

or may have not yet be infringing on, all convey tremendous but different benefits to the utility, effectiveness, dynamism, automation, user-friendliness and attractiveness of websites, broaden business reach and enhancing efficiency and profitability of business operations of the website owners.

## FRIENDLY NOTIFICATIONS OF PATENT INFRINGEMENT WERE SENT TO DEFENDANTS IN 2017 AND 2019, AND DEFENDENTS HAVE IGNORED THE NOTIFICATIONS WHILE CONTINUING THE INFRINGEMENTS

11.    Friendly patent infringement notification letters were sent to Defendant Saudi Aramco in September 2017 and again in March 2019, accompanied with crystal clear evidence of Defendants' infringements and unauthorized use of Plaintiffs' patented inventions through claim-charts. The notifications to Defendants also requested data of the levels and start dates of infringements by Defendant Saudi Aramco and all of its subsidiaries' on patented inventions belonging to Plaintiffs, and invited Saudi Aramco to contact Plaintiffs to discuss and negotiate legally required, reasonable, fair and mutually agreeable licensing and royalty fee schedule to convert Defendants' past illegal use of Plaintiffs' Intellectual Properties into lawful and licensed use. Exhibit 5A shows the two notification letters with claim-charts demonstrating examples of Defendants' infringements of Plaintiffs' patents listed in the letters. The September 20, 2017 letter included two claim-charts evidenced from the top portion of the homepage of Defendants' main website www.SaudiAramco.com captured in July and September 2017 which used the same content-sets to display in a designated display area in the top portion of the homepage one content-set at a time—in a time-multiplexed fashion, but used two different mechanisms of changing from displaying one content-set in one time-period to displaying another content-set in another time-period.  These two claim-charts exemplified infringements on two of the family of seven patents listed and explained in sections 1, 2, 9 and 10 of this Complaint. The March 22, 2019 letter included claim-charts exemplifying Aramco Energy Ventures (https://saev.com) and Aramco Trading Company (https://aramcotrading.com/) infringements on at least one of the family of seven patents. Both notification letters were addressed to the Board and Executive

Management Team of Saudi Aramco and also specifically to the CEO and President Mr. Nasser and SVP/General Counsel and Corporate Secretary Mr. Mansour. Both notification letters have been ignored, and Defendants' illegal/theft use of Plaintiffs Intellectual Properties has continued. Exhibit 5B shows examples of Defendants' recent infringements. Such behavior can only be characterized as arrogant and willful Intellectual Property Theft in the form of Patent Theft.

12. Patents protect inventions proven novel and conveying large benefits by professional, exhaustive and lengthy examination processes at US Patent and Trademark Office (USPTO), thus they are the most reasonably and legally exclusive, protected and valuable class of Intellectual Properties with large damage awards on infringements and heavily penalized on willful infringements and theft.

## THE NATURE OF DEFENDANTS' INTELLECTUAL PROPERTY THEFT AGAINST PLAINTIFFS IS CONTRARY TO DEFENDANTS' PRONOUNCED CORPORATE VALUES, ETHICS AND PRINCIPLES OF GOVERNANCE

13. Defendants Saudi Aramco et. al. is the most profitable multinational conglomerate in the world, claiming noble corporate values and visions on its website in corporate governance, values, ethics, social responsibilities and world citizenship. Defendants espouse creating value through innovation, technology development and technology breakthroughs. Exhibit 6A shows the www.SaudiAramco.com/en/creating-value/technology-development/in-house-developed-technologies page, in which Saudi Aramco proudly declared and described in the first place its **"Shallow Water Inspection and Monitoring Robot Technology"** stating it " **is protected by seven filed patents**." Defendants are obviously aware of the fact that Patents protect the high value of innovations and inventions as precious Intellectual Properties. Defendants also espouse the elevation of human potential, entrepreneurship, and the importance of funding startups, caring for local communities with activities which improve the wellbeing of communities and community members, and funding and assisting small- and micro-businesses in local communities. Exhibit 6 illustrates such noble visions espoused on Defendants' websites by

beginning with these sites' implementation, deployment and use of Plaintiffs' invention taught in Patent 8,438,487: a hidden nested and cascading informational-categorical structure for a website that is embedded under the first level category titles that are shown in essentially all pages on the website, which a site visitor can call forth in a temporary pop-up or drop-down menu to browse and search for the desired sub-category of information before committing to clicking a main-category or subcategory title to activate the link imbedded in the category title to bring forth the information page for the desired category of information. This patented invention has been used in all of Defendants' websites. Key pages related to Saudi Aramco's corporate governance, ethics, values, and emphasis in innovation and technological development and breakthroughs are shown in Exhibit 6 following the temporary drop-down menus taught by Plaintiffs' Patent 8,438,487.

14.     Yet, Defendants see fit to steal at least 8 patented inventions from Plaintiffs, who are American small-entity inventors, while continuing their patent theft against Plaintiffs even after receiving Plaintiffs' patent infringement notification letters with crystal clear examples evidencing Defendants' patent infringements in illustrated claim-charts. Defendants have also ignored Plaintiffs' request for Defendants' usage data (of Plaintiffs' patents) including start dates and number of infringing pages of Defendants' websites against all of Plaintiffs' patents which is required to determine the value Defendants have derived from the use of Plaintiffs' patents. Such records are normally kept in website servers and IT and Marketing Departments, allowing Defendants complete and easy access. Patent infringers are required to provide such records and data to patent owners when notified by patent owners with proven and demonstrated examples of infringement. Defendants have also ignored Plaintiffs' invitations to negotiate in good faith for a reasonable, fair and mutually agreeable licensing and royalty fee schedule to convert Defendants' past unauthorized and illegal use of Plaintiffs' patents into lawfully licensed use, which would be to Defendants' advantage over litigation which often comes with punitive damages many times of calculated accrued and expected future damages.

15. Patented inventions by small-entity inventors are especially important to the ecosystem of innovation and the health, welfare and advancement of a vibrant economy and the future of any society. Robbing the small-entity inventors/patent-owners of their well-deserved licensing and royalty fees earned through years of hard work and monetary investments in recognizing and identifying problems, solving them with innovative thinking, trying various ideas, refining and proving workable inventions/solutions and applying for patent protection through a very costly, difficult, labor intensive and even tedious examination processes, not only damages the small-entity inventors/patent-owners directly, but also harm and damage society and communities, including employees, customers and partners of Defendants, and the general public who are end-users of Defendants' products.

16. All Defendants' websites which infringe on Plaintiffs' patents are used and accessed internationally by Defendants' board of directors, management, customers, affiliates and partners, shareholders, employees and potential IPO investors worldwide, including in the United States of America (USA) to promote and sell Defendants' products and services, and to conduct and transact businesses worldwide including in the USA. Defendants' patent-theft against Plaintiffs also cause/induce Defendants' customers, clients, affiliates partners, contractors, directors, management and employees, shareholders and potential IPO investors worldwide to also infringe on these patents.

17. Plaintiffs have been victimized by seven years of RICO assaults/attacks carried out by a syndicate led by Chubb Group of Insurance Companies and a group of co-conspiring predatory financial institutions spearheaded their lawyers and aided by corrupt local judges to bankrupt and incapacitate Plaintiffs, designed to destroy and completely incapacitate Plaintiffs from multiple angles so that Plaintiffs would not be able to enforce their Intellectual Property (IP) Rights against these gangster corporations who have stolen these same patents from Plaintiffs. They nearly succeeded. In 2018 Plaintiffs found that the predatory gangster financial institutions have been stealing Plaintiffs' patented inventions (since 2010/2011). Plaintiffs did

notice that Chubb et. al.'s RICO attacks against Plaintiffs have apparently coordinated with the predatory financial institutions predatory actions against Plaintiffs. But in a prolonged state of being deceived while led by the nose, the befuddlement, confusion, preoccupation, depression and incapacitation by the bizarre mix of open and cloaked attacks, Plaintiffs did not recognize the **Intellectual Property (IP) Theft** elements and relationships involved in these entities' coordinated RICO actions against Plaintiffs. Through serendipity which is akin to guidance by God's invisible hands, Plaintiffs recently discovered that **Chubb has been selling corporations, especially financial institutions Intellectual Property (Theft) Liability Protection products internationally for decades and in Peoples' Republic of China (PRC) since Y 2000**. Plaintiffs found forty largest of PRC's giant State Owned Enterprises (SOEs) and other multinational corporations having been stealing these same eight patents and additional ones of Plaintiffs' patented Intellectual Properties beginning also in 2010/2011 alongside the predatory financial institutions attacking Plaintiffs in coordination with Chubb—largely mostly if not all insured by Chubb's Intellectual Property (Theft) Liability Protection products, while being customers and clients, and even investors to these US based financial institutions and Chubb. Chubb itself has been stealing at least Patent 8,438,487 since 2009. Plaintiffs believe Defendants aspiring to noble values, visions, ethics and social responsibilities as declared on Defendants' websites could not possibly be a participant to the RICO crime activities against Plaintiffs. Though, it is still likely that Defendants may have purchase Chubb's or another insurer's "Intellectual Property (Theft) Liability Protection insurance. It is only fair and reasonable that Defendants answer this question.

BENEFITS TO THE DEFENDANTS AND INJURIES TO THE PLAINTIFFS

18.     By Defendants conducting international business through its website(s) which infringe (willfully) on at least the above listed eight patents owned by the Plaintiffs, promoting, advertising and selling Defendants' products and services and conducting international business through its website(s), promoting Defendants' image, recruiting employees and contractors and attracting new customers, businesses, affiliates and investors Defendants have benefitted. By

refusing to even discuss paying legally obligated fair and reasonable licensing and royalty fees to Plaintiffs, Defendants have deprived Plaintiffs of earned and owed income, and thus have taken from Plaintiffs' livelihood causing a severe and adverse impact on Plaintiffs who are forced to live an economically deprived life. Also lost to Plaintiffs are economic advantages and opportunities that the licensing and royalty fees would have afforded them: e.g. commercializing Plaintiffs many breakthrough technological inventions, enjoying the deserved quality of life including ability to be freed of financial hardship and anxieties, and to be able to gift to causes Plaintiffs deeply care about—such as cultivating young people's skill, potential and capability in effective and innovative problem solving, assisting other small-entity inventors to apply patents for their inventions and enforce their patent rights, invest in small-entities to startup businesses and entrepreneurs to commercialize their inventions, and many other causes and activities which uplift societies and communities. These aspirations of Plaintiffs are not different from the visions and values Defendants have espoused on their websites. Defendants' have deprived Plaintiffs' quality of life and economic opportunities and advantages by depriving Plaintiffs of licensing and royalty fees Defendants have owed Plaintiffs, gravely injuring Plaintiffs. Defendants are liable for these damages Defendants have caused Plaintiffs to suffer.

19. As a result of Defendant's cheating Plaintiffs of their deserved income in licensing and royalty fees, Defendants have caused Plaintiffs damages and suffering including but not limited to those described/exemplified above. Plaintiffs therefore are entitled to monetary damages in an amount adequate to compensate Plaintiffs for Defendant's theft of Plaintiffs' intellectual property assets, no less than reasonable licensing and royalty fees and other economic loss and damages Defendants have caused Plaintiffs together with costs and interests as the Court deems proper and fair.

20. Defendants' willful patent theft has continued, and they have injured and continue to injure Plaintiffs, unless and until this Court enters an injunction prohibiting further and future infringement of these and other Plaintiffs' patents and enjoining further use of these patents on

the Defendants' website(s) to present, advertise, promote and sell Defendant's products and services, or to communicate with, or conduct any business including any transactions with clients, customers, employees, partners, affiliates, shareholders and investors. Punitive damages are also called for in this case of a superbly profitable and rich giant multinational conglomerate willfully ripping off small-entity inventors and patent owners such as Plaintiffs.

GAUGING PATENT THEFT DAMAGES FROM RECENT INTELLECTUAL PROPERTY THEFT CASES

21.     A recent court case of **Apple v. Samsung** on Samsung initially infringing on an Apple iPhone design patent of an exact radius of iPhone's rounded corners was awarded $539 million of patent theft damages to be paid by Samsung to Apple: (https://www.theverge.com/2018/5/24/17392216/apple-vs-samsung-patent-trial-539-million-damages-jury-verdict).

22.     Another recent intellectual property theft case of **ZeniMax v. Oculus/Facebook** with Oculus stealing a few lines of software code from a computer game company ZeniMax. Facebook, the parent company of Oculus was ordered to pay $250 Million plus fees and interest to ZeniMax for the IP Theft by Oculus from ZeniMax of copyrighted software. This number was reduced by an appeals court from the $500 Million awarded by the West Taxes District Court. (https://www.engadget.com/2018/06/28/facebook-zenimax-oculus-lawsuit-payout/) Oculus is wholly owned by Facebook and does not yet have a product or revenue from the theft of the three lines of software.

23.     An invention taught in a Utility Patent conveys far more benefits to an infringer than a Design Patent, thus is worth more money. The same holds true when comparing a Utility Patent of a major invention to copy righted material, including the few lines of software stolen in the ZeniMax v. Oculus/Facebook case. Thus, the damage award on the extensive and willful theft by the Defendants of at least 8 Utility Patents owned by the Plaintiffs shall be rated higher than in the above two recent cases.

# **PRAYER FOR RELIEVE**

WHEREFORE, Plaintiff respectfully requests that this Court enter:

a. A judgement in favor of Plaintiffs that Defendants have infringed, either literally and/or under the doctrine of equivalents, patents: 7,308,653; 7,712,044; 8,108,792; 8,850,352; 9,053,205; 9,405,852; 10,296,198 and 8,438,487.

b. A Court Order to Defendants to provide to Plaintiffs the detailed infringement records requested in Plaintiffs infringement notification letters sent to Defendants, and records/information on Defendants' Intellectual Property (Theft) Liability insurance programs, if any.

c. A permanent injunction prohibiting Defendants from further acts of infringements of these patents and on any other patents which Plaintiffs own.

d. A judgement and order requiring Defendants to pay Plaintiffs damages, costs, expenses, and pre-judgement and post-judgement interest for Defendants' willful and organized patent theft and plunder of the 7,308,653 patent, the 7,712,044 patent, the 8,108,792 patent, the 8,850,352 patent, the 9,053,205 patent, the 9,405,852 patent, the 10,296,198 patent, and the 8,438,487 patent, but no less than reasonable licensing and royalty fees for all years of the Defendants' organized theft and plunder of these patented inventions, and Plaintiffs' damages in lost economic advantages and livelihood due to Defendants' plundering of Plaintiffs' intellectual properties in amounts the Court rules as just.

e. A judgement and order requiring Defendants to provide an accounting and to pay supplemental damages to the Plaintiffs, including without limitation, pre-judgement and post-judgement interests;

f. A judgement and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and the RICO Act, and award Plaintiffs reasonable Attorneys' fees against Defendants;

g. A judgement and order for punitive damages of at least three times that of the above ordinary damages which the Court rules. Plaintiffs vow to deposit the punitive damages

into a Non-Profit Foundation dedicated to assisting small-entity/small-business, entrepreneurial, startup and University inventors to enforce their intellectual property rights including patent rights against corporate plunder and theft, and to protect them from ruinous attacks of all forms directly or indirectly by corporate intellectual property infringers/thieves including patent thieves. The Foundation will also assist small-entity/small-business, entrepreneur and startup inventors and University inventors to file for patents for their inventions and commercialize their patented inventions, as well as teaching, fostering and assisting innovative problem solving in the United States of America.

h.  Any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury of any issues so triable by right under Rule 38 of the Federal Rules of Civil Procedure.

Dated: December 12, 2019

Respectfully submitted by,

*Catherine K Hendel*
Dr. Catherine G. Lin-Hendel, Ph.D. Physics, Prose
Email: linhendel@gmail.com; Mobile: (408) 761-3559

*R. Hendel*
Dr. Rudolf H. Hendel, Ph.D. Physics, Prose
Email: rudihendel@gmail.com; Mobile: (408) 533-5847

Prose Plaintiffs
Home phone: (908) 273-3378
Cell Phones: (408)-761-3559; (408)-533-5847
Address: 26 Ridge Road, Summit, NJ 07901

List of Exhibits:

Exhibit 1: US Patent 7,308,653 as published by USPTO, an first and claims pages of the other 6 patents in this patent family 7,712,044, 8,108,792, 8,850,352, 9,053,205, 9,405,852 and 10,296,198 which share the same specification with 7,308,653.

Exhibit 2: US Patent 8,438,487; Priority Date 5/24/1999, Application Date 5/23/2000

Exhibit 3: Plaintiff Dr. Lin-Hendel Patent Portfolio.

Exhibit 4A-Reuters 6/12/2019: Saudi Aramco reports 2018 net income
-Reuters 9/11/2019: Saudi Aramco gives nine banks top roles on World's biggest IPO
-New York Times 4/1/2019: Saudi Aramco Is the World's Most Profitable Company, Beating Apple by Far.

Exhibit 4B-1: Brief Saudi Aramco History;

Exhibit 4B-2: Technology Breakthroughs in Research Centers in the US; and

Exhibit 4B-3: Saudi Aramco subsidiaries in the USA, and list of JVs, Affiliates and Subsidiaries.

Exhibit 5A: Infringement Notification Letters sent to Saudi Aramco on 9/20/2017 & 3/22/2019.

Exhibit 5B: Four recent examples of infringements by Saudi Aramco, Aramco Ventures, Aramco Trading Company, and Aramco Americas, and one suggestion for implementation for the present Saudi Aramco homepage.

Exhibit 6A: Saudi Aramco In-house developed technologies: **the most prized and first listed is protected by seven patent applications**—see page 2. (10 pages)

Exhibit 6B: Brows-able Dropdown Informational Categorical Menu(s) for 5 top level categories in www.SaudiAramco.com : Who we are;  Creating value;  Making a difference; Partnering with us;  Investors;   IPO. The drawn line shape around certain sections of the menus indicate subjects relevant to the noble corporate governance, ethics, visons and emphasis on technological development and innovation as fuel for world and community economic future. (7 pages)

Exhibit 6C: Brows-able Dropdown Informational Categorical Menu(s) for 5 top level categories in https://Americas.Aramco.com: Who we are;  Creating value;  Making a difference; Partnering with us. (6 pages)

Exhibit 6D: SA/Corporate Governance: Ethics and governance, Living our values. (5 pages)

Exhibit 6E: SA/Creating value: Investing in Startups, Technology Development. (11 pages)

Exhibit 6F: SA/Making a difference/People and community: Accelerating human potential, Supporting Communities. (13 pages)